918 So.2d 283 (2005)
In re CERTIFICATION OF NEED FOR ADDITIONAL JUDGES.
No. SC05-2120.
Supreme Court of Florida.
December 15, 2005.
PARIENTE, C.J.
In this opinion we discharge our constitutional responsibility to determine the state's need for additional judges in the coming year and to certify "our findings and recommendations concerning that need" to the Legislature.[1] This is one of the Court's most crucial duties because the availability of judges to hear and decide cases in the county, circuit, and district courts is essential to fulfilling the guarantee of timely and meaningful access to justice for the people of Florida. See Art. I, § 21, Fla. Const. ("The courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay."). Certification is "the sole mechanism established by our constitution for a systematic and uniform assessment of this need." In re Certification of Need for Additional Judges, 889 So.2d 734, 735 (Fla.2004).
As in the past, we have used a weighted caseload system for the trial courts as required by the Legislature.[2] Applying these objective standards, we have considered judgeship requests submitted by the lower courts, examined case filing and disposition data, and analyzed various judicial workload indicators. In addition, in this year's assessment of the needs of the district courts of appeal, we have applied criteria newly recommended by the Commission on District Court of Appeal Performance and Accountability, as discussed below.
*284 In certifying the net need we have taken into consideration the fifty-five judgeships that were funded last session by the Legislature and signed into law by the Governor. This was half of the 110 judgeships certified. See In re Certification, 889 So.2d at 735. The court system is benefiting from the new judgeships created last year. In addition, during the special session held December 5-8, 2005, the Legislature authorized two new circuit judgeships for the Twentieth Circuit and two new county judgeships for Collier County in House Bill 41B, which the Governor has signed into law. There remains, however, a significant unfilled need for new judges. Taking into account the newly funded positions and applying objective criteria, we have concluded that the judicial need is sixty-six additional judgeships: two in the district courts of appeal, forty in the circuit courts, and twenty-four in the county courts. We note that had all the circuit and county judgeships that we certified last year been funded, this year we would be certifying the need for only an additional eleven judgeships for the county and circuit courts. These judicial positions, if funded, will eliminate the remaining gap between the present number of judges and the additional need.

TRIAL COURTS
Trial court judges are on the front lines in dispensing justice in Florida's courts. Approximately ninety-nine percent of court filings in Florida are processed in the circuit and county courts. Thus, the work of trial judges is vital to our citizens and businesses, who expect our judicial branch to help resolve issues fairly, peaceably, expeditiously, and in a manner that promotes the rule of law.
As stated above, this Court uses a case-weighting system based on accepted standards of measurement in determining the need for additional judges.[3] The case weighting system distinguishes different types of cases and addresses the differences in the amount of time that must be spent on cases of each type, producing a total judicial need for each circuit. Additionally, we adjust for differing jury trial rates in each circuit and county and consider the actual number of judges requested by the chief judge in each circuit. The resulting certification is an objective statement of what the trial courts need to meet their workload.
The gap between the certified need and the authorization of new judges was significantly narrowed during the 2005 Legislative Session. However, even with the new positions, judicial workload remains high. Florida, the nation's fourth largest state, ranks second highest among the ten largest states in filings per judge. Remarkably, as of 2003, our general jurisdiction judges handle approximately sixty-four percent more filings per judge than the national average.[4]
*285 Further, as we noted in last year's certification opinion, several factors peculiar to Florida affect judicial workload:
First, our population swells during the winter months, which produces increased activity of all kinds that impacts judicial workload. Second, the changing demographics of Florida affect our judicial system and strain its capacity. For example, the continued growth of non-English-speaking residents increases the need for court interpreters. Typically, these cases take longer to process and may contribute to delays in case processing times. Likewise, Florida's aging population has resulted in an increase in guardianship, probate, and other cases. Lastly, geographic complexities in multi-county circuits have placed additional workload demands on the circuit courts because of required travel between courthouses.
In re Certification, 889 So.2d at 737-38.
Compounding the need for additional judges is the growth in family court cases, such as those involving dissolutions of marriage, domestic violence, and repeat violence. Filings in dissolutions of marriage, domestic violence, and repeat violence cases increased by approximately thirteen, eight, and fifty-three percent respectively from fiscal year 1999-2000 to fiscal year 2003-04. For domestic violence and repeat violence cases, this trend began in the early 1990s. Since fiscal year 1991-92, there has been a fifty-seven percent increase in domestic violence filings and a one hundred eighty-six percent increase in repeat violence filings. Many of these cases involve complex issues affecting the well-being of children and families. The capacity to expeditiously hear and render decisions that are in the best interests of our children depends on an adequate number of judges and supplemental resources.
From fiscal year 1999-2000 to fiscal year 2003-04, there were significant increases in filings in several case types in the probate divisions. Marchman Act[5] cases lead the division with approximately a seventy-three percent increase, while Baker Act[6] and other social cases[7] increased by approximately twenty-three percent. Baker Act case filings are expected to continue this growth trend with the recent legislation creating a new procedure for involuntary outpatient placement. Filings in the remaining categories of circuit civil cases, including eminent domain, administrative agency appeals, replevins, and habeas corpus proceedings, increased by twenty percent from fiscal year 1999-2000 to fiscal year 2003-04.
Caseloads in the county courts continue to increase at a rate even greater than in the circuit courts. Overall, county court filings, excluding civil traffic infractions, increased approximately fourteen percent from fiscal year 1999-2000 to fiscal year 2003-04. In fact, during that period, significant increases occurred in five of the eight county court case types. The county court civil divisions had the greatest increases: small claims, civil (matters involving claims ranging from $5,001 through $15,000), and eviction cases underwent forty-five percent, thirty percent, and twenty percent increases in filings, respectively. *286 In addition to the increased number of filings, civil cases in the county courts are often brought by unrepresented litigants who tend to be unfamiliar with statutes, court rules, and court procedures. For many Floridians, the county court judges are the face of the justice system. It is critical that all county court cases, including those with unrepresented litigants, receive adequate time and attention.

UPDATED CASE WEIGHTS
The Legislature has enacted a number of laws affecting the work of the courts since the case weights were adopted in 2000. In addition, significant supplemental resources were allocated when the state court system became fiscally unified with the July 1, 2004, implementation of the amendment to article V, section 14 of the Florida Constitution.[8] Together, these two factors warrant re-evaluation of the original case weights. A judicial resource workgroup comprising judges and trial court administrators has begun the process of updating these case weights. This process will take approximately twelve to eighteen months to complete. The National Center for State Courts' final report on Florida's weighted caseload system, issued in January 2000, recommended that the weights be evaluated every five years to preserve the integrity of the system.[9] We are now six years removed from the original study; thus, the case weights should be updated. We will keep the Legislature fully apprised of our efforts.

SUPPLEMENTAL RESOURCES  TRIAL COURT LAW CLERKS
Supplemental resources assist our judges in the fundamental mission of safeguarding Floridians' constitutional rights of due process, equal protection, and access to courts. The Legislature, by funding the fiscal unification amendment to Article V, Section 14, recognized the valuable contribution that case managers, mediators, and magistrates make to the efficient and effective operation of the trial courts. However, further funding by the Legislature of judicial law clerks for trial judges is needed in order to facilitate the adjudication of cases.
Judges rely on the support of professionals trained in the law to help them dispose of their cases. It is an inefficient use of judges' time for them to perform tasks that can be capably performed by support staff, such as reviewing lengthy hand-written pleadings or performing detailed legal research. Judges' ability to manage their caseloads and make informed decisions is enhanced when they are able to assign these and other tasks to law clerks.
Law clerks are particularly useful in assisting trial judges with the tremendous workload generated by criminal cases in which prisoners challenge their judgments or sentences in postconviction proceedings. Over the past ten years, the number of postconviction filings in the trial and intermediate *287 appellate courts has grown substantially. This is largely attributable to statutory changes relating to sentencing, the growth in the prison population, and the increase in time served by prisoners. The preparation and review of postconviction matters is labor-intensive and law clerks are essential to the process.
As a result of the increased workload, chief judges have been forced to reallocate law clerks from other divisions of court to provide support to postconviction matters. Even with this reallocation, many circuits struggle to avoid delays in handling these matters. We strongly encourage the Legislature to consider our Legislative Budget Request related to judicial law clerks, who perform a vital service for the trial courts in multiple areas and are particularly useful in capital cases, county to circuit appeals, and complex civil litigation in addition to postconviction proceedings.

RELATED PUBLIC SAFETY ISSUES
We have documented the need for more judges in our criminal divisions. In addition, the chief judges throughout the state have advised us that of the judges authorized during the 2005 legislative session, twelve circuit judges have been assigned to preside over felony matters and fourteen county judges are presiding over misdemeanors. Without adequate funding for state attorney and public defender offices, the ability of the judicial system to properly, timely, and efficiently handle these cases is compromised. Therefore, we urge the Legislature to take into consideration the needs of the justice system as a whole, and particularly the prosecution and indigent criminal defense components, in addressing the funding of the additional judgeships.

TRIAL COURT CERTIFICATION
In light of the foregoing considerations, we certify the need for forty new circuit court judges for fiscal year 2006-07, distributed as follows:
1. Six additional circuit judges for the Twentieth Circuit;
2. Four additional circuit judges each for the Fifth, Eleventh, and Thirteenth Circuits;
3. Three additional circuit judges each for the Fourth, Ninth, and Seventeenth Circuits;
4. Two additional circuit judges each for the First, Seventh, Tenth, and Twelfth Circuits; and
5. One additional circuit judge each for the Second, Sixth, Fourteenth, Eighteenth, and Nineteenth Circuits.
Further, we certify the need for twenty-four new county court judges for fiscal year 2006-07, as follows:
1. Five additional county judges for Broward County;
2. Three additional county judges each for Pinellas and Brevard Counties;
3. Two additional county judges each for Pasco and Orange; and
4. One additional county judge each for Duval, Marion, Osceola, Polk, Miami-Dade, Palm Beach, Charlotte, Collier, and Lee Counties.
In addition to the judges we have certified above, we also have reviewed the following requests, which we deny for the following reasons. We have specifically reviewed the requests from chief judges to certify another additional circuit judge each in the Sixth, Ninth, Tenth, and Twelfth Circuits, one county judge in Columbia County, and another additional county judge in Miami-Dade County. When the judgeships we have certified are taken into account, the remaining net judicial need is less than 0.5 for each of the judgeships requested. We have determined that in the absence of special circumstances, *288 we must deny these requests.[10] We emphasize that in addition to mathematical calculations, our staff performs extensive analysis of each circuit's request in order to analyze the availability of supplemental resources and any special circumstances justifying an exception. In accordance with these uniform procedures, we decline to certify the remaining requests.

DISTRICT COURTS OF APPEAL
Total case filings in the district courts increased by approximately thirteen percent from fiscal year 1999-2000 to fiscal year 2004-05. Despite this significant increase in burden, the number of judges in the district courts has remained constant since the 1999 legislative session. In fact, in the last decade, only one new district court judge has been authorized and funded.
At our request, the Commission on District Court of Appeal Performance and Accountability has been actively reviewing the criteria established in the Florida Rules of Judicial Administration for evaluating judicial workload in the district courts. Over the past year, the Commission has reviewed Florida's current certification rule, the national appellate court performance standards, the mission of the district courts of appeal and the complementary charge of the Committee on Appellate Workload and Jurisdiction.[11] The Commission's initial analysis included a review of the existing certification criteria to identify those that directly correlate to judicial workload and those that do not.
Significantly, the Commission found that many of the criteria in rule 2.035(b)(2) are not accurate measures or reliable predictors of judicial workload.[12] In fact, factors such as population growth and an increase in the number of circuit court judges did not correlate with an increase in appellate workload. In the place of the prior criteria, the Commission formulated new criteria grouped into four categories: workload, efficiency in case disposition, judicial effectiveness in deciding cases and performing administrative duties, and judicial professionalism in enhancing the quality of the courts, the legal profession, and the justice system as a whole.
To allow for a more accurate assessment of need, the Commission recommends against using a strict case filings per judge number and instead analyzed weighted case dispositions. In creating the new criteria, the Commission developed a process for establishing relative case weights. This process measures judicial effort associated with any given caseload. Relative weights were established only for those cases disposed of by a judge "on the merits," and not cases dismissed by the clerk of court or otherwise administratively disposed of. The Commission first established categories of similar cases and ranked them to identify a mid-ranked case. *289 Then, judges from each district were asked to approximate the relative weight of each case category in relation to the mid-ranked case, identified as an appeal from a criminal judgment and sentence. Relative weights were then assigned to each type of case, ranging from an appeal from a final judgment in a civil case to a criminal appeal in a case disposed of pursuant to Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). These weights were then applied to each court's dispositions on the merits to determine the weighted caseload value.[13]
The weighted caseload is a more accurate representation of judicial workload in that it addresses differences in the amount of judicial time that must be spent on each type of case. Relative case weights are useful in many ways. First, they demonstrate how a court's judicial workload has increased or decreased over time. Second, they allow a comparative assessment of the distribution of judicial workload between districts. Lastly, they contribute to an analysis of how the use of other nonjudicial resources can affect judicial workload.
The work of the Commission remains pending. We have asked the Commission to develop a weighted caseload range as an objective measurement of the need for a new judgeship. In anticipation of the Commission's response, we have not formally incorporated its proposed criteria into the Rules of Judicial Administration. Nonetheless, we asked the chief judges of the district courts to apply the new criteria when requesting new judgeships this year because we consider them to better reflect judicial workload in the district courts of appeal than the criteria identified in the current rule.
Over the past five years, the greatest increases in filings have been in the Second and Fifth Districts. Further, the weighted caseload dispositions per judge is highest in the Second District, and would support a request for two additional judges. However, the Second District's use of central staff attorneys and case management techniques for processing postconviction cases results in efficient case disposition that reduces the need to one additional judge. The Fourth District's number of cases filed per judge in fiscal year 2004-05 places it well above the mean for the five district courts of appeal. Gauged by relative case weights, the Fourth District's present workload is second only to that of the Second District.
Although the Fifth District is projected to have the highest number of filings per judge of any of the district courts for fiscal year 2005-06, its caseload is only the third highest under the case weighting method. However, in its request to this Court, the Fifth District notes that its experience managing caseloads demonstrates that for the judges to perform adequately and at a level consistent with historic performance, an additional judgeship is needed. Nevertheless, we cannot ignore the fact that the Fifth District's weighted case dispositions are at almost the exact same level as those of the First District at the present time. More importantly, if the Fifth District were to obtain an additional judge, its weighted case dispositions would place the Fifth District significantly below three of the five district courts of appeal.

DISTRICT COURT CERTIFICATION
The Second District last received an additional judge in 1993. The most recent addition of a judgeship in the Fourth District *290 was in 1988. Statewide, the district courts of appeal recorded an average of approximately 396 case filings per judge in fiscal year 2004-05. However, for the same time period, the Second, Fourth, and Fifth Districts experienced approximately 434, 421, and 429 case filings per judge, respectively. Of even greater significance are the increases in the weighted caseload per judge data. The Second and Fourth Districts have the highest weighted caseloads per judge. In consideration of our previous years' certifications, we once again certify the need for one additional district court judge in the Second and Fourth Districts, for a total of two new district court judgeships. Based on the analysis we have performed, we are unable to certify a need this year for an additional district court judgeship for the Fifth District.

CONCLUSION
The judges in our state courts play a vital role in safeguarding democracy. They interpret and apply the law, peacefully resolve disputes, and protect the rights and liberties of all citizens, including our most vulnerable. The cases adjudicated by our courts touch the lives of all Floridians. Further, our state courts system accomplishes its mission with great efficiency, using less than one percent of the budget of the State of Florida.
Floridians' access to justice has improved with fiscal unification, now in its second year. Many of the resource inequities that existed before July 1, 2004 have been eliminated. Delivery of services by the justice system is now better balanced across counties and circuits than ever before. Today, each circuit has an equitable allocation of support staff such as hearing officers, magistrates, mediation, and case managers. This distribution of resources has given citizens across Florida access to the same system of justice regardless of their location or the tax base of the county in which they live. Together, these resources can make a qualitative difference in the delivery of justice in communities throughout the state.
The fifty-five new judgeships funded during the 2005 Legislative Session have also improved Floridians' access to justice. However, the new judgeships met only half of the need we certified last year, and the need has increased in the interim. The December, 2005, funding of four additional judgeships represents another positive step in meeting the remaining need. We call upon the Legislature and the Governor to complete the process begun during the last regular session and fund all the judicial positions that Florida's citizens need and deserve.
It is so ordered.
WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Article V, section 9 of the Florida Constitution provides in pertinent part:

Determination of number of judges.  The supreme court shall establish by rule uniform criteria for the determination of the need for additional judges except supreme court justices, the necessity for decreasing the number of judges and for increasing, decreasing or redefining appellate districts and judicial circuits. If the supreme court finds that a need exists for increasing or decreasing the number of judges or increasing, decreasing or redefining appellate districts and judicial circuits, it shall, prior to the next regular session of the legislature, certify to the legislature its findings and recommendations concerning such need.
[2] Our certification methodology relies primarily on case weights and calculations of available judge time to determine the need for additional trial court judges.
[3] This system was developed in response to the proviso language of the 1998 General Appropriations Act, in which the Legislature directed that the judicial branch employ a certification methodology that relies on case weights and calculations of available judge time to determine the need for additional trial court judges. See ch. 98-422, § 7, at 3963, Laws of Fla. Pursuant to this direction, the judicial branch undertook an extensive project to design and implement a weighted caseload system, assisted by the National Center for State Courts and endorsed by the Office of Program Policy Analysis and Government Accountability.
[4] See National Center for State Courts, Examining the Work of State Courts, 2004 (Brian J. Ostrom et al. eds., 2004), available at http://www. ncsconline.org/DResearch/csp/2004 Files/ EWFrontfinal2.pdf.
[5] See ch. 397, Fla. Stat. (2004).
[6] See ch. 394, Fla. Stat. (2004).
[7] The term "other social cases" includes cases that are filed in the probate division but are not captured in any of the other discrete probate categories. Cases in this category usually involve involuntary commitment unrelated to the Baker or Marchman Acts. Examples include tuberculosis cases, developmental disability cases, incapacity determinations, and actions related to the Adult Protective Services Act.
[8] The unification amendment is known as Revision 7, corresponding to its number among the proposed amendments on the 1998 general election ballot.
[9] The report states:

Recommendation 2: The OSCA should plan to conduct a systematic update of the case weights approximately every five years, depending on the judgment of the Court Statistics and Workload Committee. Funding for this should be part of the regular legislative agenda related to the process of certification of the need for new judgeships.
Brian J. Ostrom et al., Florida Delphi-Based Weighted Caseload Project Final Report 75 (2000), available at http://www.florida supremecourt.org/ pub  info/highprofile / DelphiFullReport. pdf
[10] Total judicial need is the total number of judges required to complete all expected workload. Net judicial need is the difference between the total judicial need and the number of existing judges.
[11] This Committee developed recommendations to the Supreme Court on uniform criteria for a determination to increase, decrease, or redefine the appellate districts. See Committee on District Court of Appeal Workload and Jurisdiction, Report and Recommendation, (2005) (on file with the Supreme Court of Florida), available at http://www.florida supremecourt.org /pubinfo/documents/ DCA-Workload/WorkloadReport.pdf.
[12] See Commission on District Court Performance and Accountability, Workload Report to the Supreme Court (2005). This draft report is available by contacting the Strategic Planning Unit of the Office of the State Courts Administrator.
[13] For a complete discussion of this issue, see the September 2005 report of the Commission. Weighted caseload is based on the state average relative weights of cases disposed of on the merits established in September 2005.